**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| CHARLES EDWARD COLLINS, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § Case No. 2:19-cv-00013-RSP |
| CHARLES "CHASE" DOTSON, *Individually*, | § |
| CRUZ VENCES, *Individually*, | § |
| RYAN ROOP, *Individually*, | § |
| CALEB ODEN, *Individually*, | § |
| CLINT MATHERS, *Individually*, and | § |
| JONATHAN SMITH, *Individually*, | § |
| | § |
| *Defendants*. | § |

## MEMORANDUM ORDER

Plaintiff Charles Edward Collins sued six law enforcement officers under 42 U.S.C. § 1983. He alleges that Charles "Chase" Dotson unconstitutionally arrested him and used excessive force during the arrest and that the five other officers present at the scene did not intervene and thus, are liable under a theory of bystander liability.

In response, Defendants Ryan Roop, Caleb Oden, Clint Mathers, Cruz Vences, Jonathan Smith (collectively "Bystander Defendants"), and Dotson (together, collectively, "Defendants") each filed a motion for summary judgment based on qualified immunity.[1] (Dkt. Nos. 55–59, 53). Further, Dotson filed a motion to strike Collins' summary judgment evidence (Dkt. No. 68) and Collins filed a motion to strike the Bystander Defendants' expert affidavit (Dkt. No. 69).[2]

After conducting a hearing on the issues, the Court concludes, for the reasons set forth herein, that the motions by Dotson, Roop, Oden, Smith, and Collins (Dkt Nos. 53, 55, 56, 59, 68, 69) are **DENIED**. The motions by Vences and Mathers (Dkt. Nos. 57, 58) are **GRANTED**.

---

[1] The Court finds that Defendants' motions to dismiss (Dkt. Nos. 10, 11, 12, 13, 37, 40, 42, 44, and 46) are superseded by the motions for summary judgment addressed in this order.
[2] This docket entry is also Collins' sur-reply to the Bystander Defendants' motions for summary judgment.

## I.    BACKGROUND

### a.  Parties

At the time of these events, Dotson was a Harrison County Sheriff's Office deputy. (Dkt. No. 53 at 5). Vences was also a deputy for Harrison County. (Dkt. No. 58 at 10). Roop was a K-9 deputy for Harrison County. He had been a licensed police officer since 2005 and with Harrison County since 2011. He had spent time both as a jailer and patrol officer. (Dkt. No. 55-3, Roop Deposition, at 2). Oden had been a jailer for Harrison County for approximately one year and eight months and had performed fifty to one hundred extractions of arrestees from vehicles. (Dkt. No. 56-3, Oden Deposition, at 2–4). Smith was also a jailer for Harrison County. (Dkt. No. 59-3, Smith Affidavit, at 2). Mathers was a Sergeant jailer for Harrison County. He had been on the job for just over three years and had been a Sergeant jailer for approximately five months. Before that he had spent at least eight years as a security police officer in the military. (Dkt. No. 57-3, Mathers Deposition, at 2–3). Collins was a sixty-two-year-old oilfield consultant, who lived in Waskom, Texas with his fiancé, Sandy Graff, on her property. (*See* Dkt. No. 65 at 2; Dkt. No. 53 at 4).

### b.  Events at House and Arrest

At 12:30 a.m. on Thanksgiving Day 2018, Sandy Graff's daughter, Samantha Garcia, dialed 911, told the dispatcher that her mother had called "in a frantic," and asked him to send police officers to Ms. Graff's house because Collins was "drunk . . . [and] tearing everything up." (Dkt. Nos. 53-6, Roop Deposition, at 13; Dkt. No. 55, Ex. 5A-1, 911 Call starting at 0:10).

A few minutes later, Ms. Garcia called back, telling the dispatcher that she was at the house, everything was fine, and Collins was laying down. The dispatcher stated he would not cancel the call. When pressed, Ms. Garcia admitted that she was not yet at the house but that her mother had told her on the phone that everything was fine. The dispatcher again explained that he would not

cancel the call and that the officers could determine whether they were needed when they arrived. (Dkt. No. 55, Ex. 5A-2, 911 Call).

Soon after, Deputies Dotson, Vences, and Roop, along with Sergeant Forrest Mitchell, who is not a defendant in this case, arrived at the scene, where they saw Ms. Graff outside her residence. The facts that follow are the undisputed facts as determined by the Court based on a careful review of the video evidence. Vences approached the house and opened the front storm door, where he encountered Ms. Garcia, who was walking to him from inside the house. She explained that she had just put Collins to bed. After a few seconds, Collins approached the front door. Vences said, "Lets step in here" and Collins responded, "Yes sir." Vences, Roop, and Dotson then followed Collins inside. Collins sat down at the island countertop in the kitchen, while Vences, Roop, and Dotson stood around him. Mitchell stayed outside with Ms. Graff and Garcia. (Dkt. No. 55, Ex. 5D, Vences bodycam starting at 0:40).[3]

Inside, the house was a mess. Groceries were haphazardly strewn across the kitchen. A sliding glass door to the backyard was broken, and glass shards were all over the floor. A chair, looking like it had been thrown, was upside down next to the broken door. Collins, on his own, explained to the officers that "all this mess you see, I did it." (*Id*. starting at 1:15). When later asked why he made the mess, he stated that that he was "[j]ust angry" but that he could not remember why he was angry. (Dkt. No. 53-2, Collins Deposition, at 12–13).

During the post-arrest investigation, it was discovered that Collins had been at his fiancé's bar for around seven hours that day, drinking what he estimated to be around ten beers. Further,

---

[3] Four cameras captured the scene in the House—the bodycams of Mitchell, Dotson, Vences, and Roop. (Dkt. No. 55, Exs. 5B–E). All had comparable views, except for Dotson's bodycam, which only had audio. The video evidence provided a more accurate representation of the night than the depositions, which all had factual errors.

he had taken his prescribed ten-milligram dosage of hydrocodone, an opioid pain medication, twice that day. After leaving the bar around 10:00 p.m., he went home. (*Id.* at 8–12).

Inside the house, the deputies tried to gauge the situation. Even without knowing Collins' exact state of intoxication, it was evident that he was under the influence due to his erratic behavior and occasionally slurred speech. (Dkt. No. 53-6, Roop Deposition, at 13). The officers asked Collins what had occurred. While he gave non-answers to their questions, he emphatically and repeatedly stated two things. First, that he did not lay hands on anyone and second, that everything was his, including the house and all the items in it. Collins believed this meant that he had not committed a crime, which the officers confirmed to him. (Dkt. No. 55, Ex. 5D, Vences bodycam starting at 1:52).

When asked what his plan for the night was, Collins responded that he was "going to bed." While the conversation was somewhat disjointed,[4] the next minute essentially went as follows. Collins stood up and argued to no one in particular that he could destroy his own house if he wanted. Dotson answered, "you're absolutely right." Collins went on to say, "I can do what I want to in my own house, I can tear those cabinets off and you can't do a God damn thing about it. Now, if you want to arrest me for it, I'll sue your ass Monday. Lock me up, lock me up tonight!" Dotson responded, "We won't" but went on to say, "we're not going to take you to jail for anything besides public intoxication at this point." Collins responded, "In my own house?" Dotson explained, "We can. You're not cooperating with us." (*Id.* starting at 3:52).

After a few more minutes of this unproductive back and forth, Mitchell came inside and Vences went outside to ask Ms. Graff what happened. Ms. Graff confirmed Collins' story, stating they had been at her bar during the day. He left before her and when she came home, she found

---

[4] The Court has provided exact quotes when possible, but the poor audio quality of the videos and the fast-moving pace of the events that night makes certainty difficult.

the mess. She emphasized there was no argument between them, no assault, no violence. She then explained that she was going to spend the night with her daughter. (*Id*. starting at 7:35).

While Vences went outside, the others were inside talking to Collins, who continued to predict that the officers were going to arrest him. When asked what had happened, he explained that he had caused the mess "over a God damn fit" and that while they "don't come that often, I can throw one." He then asked the officers if "y'all think you can hold me if I want to throw a fit . . . cause I don't think you can." Despite using words that might be perceived as a threat, his tone remained joking. He then looked at Dotson and asked, "You think you can hold me big boy?" Right after, he looked at Roop and winked, while smiling. He later told Dotson, "I'm just picking on you." While Collins was laughing, the officers, particularly Dotson, did not seem amused by his behavior. (Dkt. No. 55, Ex. E, Roop bodycam, starting at 9:40; fit statement at 10:04; joke at 10:20).

Dotson then explained to Collins, "If you're saying you did all this and nobody was home, you're not going to jail because at that point you tore up your own shit. However, listen to me, the way the law is written, if you tore this up in front of family member that is family violence." (*Id*. starting at 11:03).

Vences then returned inside and Collins again sat near the kitchen island, while rambling on about how he could do what he wanted in his own house. Ms. Garcia then entered the house and went into the master bedroom, shared by Ms. Graff and Collins, to grab some clothes for her mother. Roop followed Ms. Garcia around the corner of the kitchen and out of Collins' sight line. Collins stood up and walked over, exclaiming that "you ain't got no God damn business in that bedroom." While the officers originally thought Collins was speaking to Ms. Garcia, he clarified that he was talking to Roop. Roop explained that he was standing outside the bedroom. Collins

repeatedly stated that the officers had no business going into his bedroom as his items were in there. The officers tried to explain that they needed to keep an eye on everyone in the house for safety reasons. Eventually, Vences, possibly frustrated by Collins, cursed. Collins, shocked by it, began to head back to his seat. Vences told Collins to sit down three times as Collins was slow to go back to his seat. (Dkt. No. 55, Ex. 5D, Vences bodycam starting at 9:39, Garcia enters at 11:11; Collins starts to complain at 11:43; Collins starts to sit at 12:46).

After Collins returned to his seat, the situation seemed to be defused as Vences began joking and laughing with Collins. The critical scene in the house began when Vences asked Collins. "You got chickens here?" Collins responded, "Mmhmm, four of them." Vences asked, "Where they at?" Collins said, "Chickens?" Vences said, "Yeah." Collins replied by pointing at each of the four officers while he counted, "One, two, three, four." Vences can be heard laughing, but Dotson, apparently unamused by the comment, immediately arrested and handcuffed Collins. Collins responded that it was "just what he wanted" and that he would sue them come Monday. (*Id.* starting at 15:07; joke starting at 15:27).

### c.  Ride to Jail Annex

After Dotson arrested Collins, he took Collins into his patrol car and began to drive to the Police Annex. Roop and Vences followed in their patrol cars. The in-car camera, without audio to begin, shows Collins, with his hands handcuffed behind his back, in the backseat, talking and banging his head against the divider. After two minutes of this, Dotson turned on his flashing lights. He also called the Jail Annex to inform them that he would be bringing a violent subject in and would need assistance. Sergeant Mathers, Jailer Oden, and Jailer Smith were assigned to the matter and began to prepare the Sallyport of the Jail Annex for extraction by bringing a restraint chair for Collins. (Dkt. No. 65-5, Incident Report, at 2).

Back in Dotson's car, the audio function of the in-car camera began to work and Collins can be seen lying down quietly. (Dkt. No. 55, Ex. 5G-2, Dotson car camera starting around 2:00). After about three minutes of lying down quietly, Collins sat up and banged his foot against the divider. He asked to talk to the Sheriff, while repeating that he would sue Dotson and the other officers involved in his arrest. (*Id.* starting at 5:00). He continued to talk, on-and-off, for the next few minutes, while also banging the dividing screen with his foot and head. Dotson did not reply. As the car got close to the Annex, Collins called Dotson a "big boy" and stated that "if y'all think you fixing to whoop my ass, you wrong" (*Id.* starting at 9:12; second comment starting at 9:35).

Dotson then pulled into the Annex. Roop followed, leaving a gap of a few feet between the two cars.[5] Collins, still in Dotson's car, stated, "I'm ready, God damn I'm ready when you are. Open the door." Dotson replied, "Hold on." Collins continued, "Open the God damn door. I know you all ready. I'm ready to give it my best shot. You all fixing to throw it on me. I'm fixing to throw it on your ass. I know you think you fixing to beat me." This continued for a few more seconds as the officers prepared for Collins' extraction. (*Id.* starting at 9:45).

The jailers placed the restraint chair between the two patrol vehicles. Then, they walked to the back-left door of Dotson's car. At that point, the six officers—Deputies Dotson, Roop, and Vences, Sergeant Mathers, and Jailers Oden and Smith—were outside Dotson's car ready to extract the handcuffed Collins. Roop and Vences activated their bodycams. Dotson did not do so.

### d. Arrival

Finally, Dotson opened the door. As it opened, Collins shouted, "Wait a minute! Wait a minute! Let me stick my feet out! Let me stick my feet out!" The officers disregarded Collins' pleading. Smith could be heard saying, "Wait my ass." Oden and Roop grabbed the still-

---

[5] Deputy Roop stated that there were six police officers around Mr. Collins in a confined space of about four feet between two patrol cars. (Dkt. No. 65-7, Roop Deposition, at 12).

handcuffed Collins and dragged him out of the car head first.[6] Smith then grabbed Collins' right arm, Oden held Collins' left arm, and Roop kept Collins' head down. Dotson grasped Collins' right shoulder. Mathers and Vences watched from just behind the others. As Collins was dragged backwards to the restraint chair, he tried to say something. As the words started to leave his mouth, Dotson began to punch him in the head. Three punches in, Roop let go of Collins and said, "Get the f… in that chair." Roop then turned around and turned off his bodycam. As the jailers sat Collins in the restraint chair. Dotson delivered five more even harder blows to Collins' head. None of the other police officers did anything to intervene. In the end, Dotson, over the course of around five seconds, hit Collins eight times in his head. (Dkt. No. 55, Ex. 5J, Vences bodycam in Sallyport starting at 0:37)[7].

### e. Aftermath

Jailers Brandon Moore and Nathaniel Shannon, who are not defendants, watched the scene in the Sallyport and provided statements about its aftermath. Jailer Moore described Collins as "bleeding from the lower part of the right eye, arms, wrists, and elbow. His face was also very swollen and red and there was blood all over the floor and chair." (Dkt. No. 65-5, Incident Report, at 3). Jailer Shannon further described that "Mr. Collins had swelling to the right side of his face he was also actively bleeding at the cheek and ear. Mr. Collins also had a cut on his left elbow that was actively bleeding." After removing Collins' handcuffs, the jailers saw that Collins "had bloody hands both left and right and cuts on both of his wrist from where the restraints was on to tight, this appeared to cut into his wrist and make them purple and actively bleed." (*Id*. at 5–6).

---

[6] Oden claims that Collins's mouth touched his arm, but the video evidence does not support this claim.
[7] Four cameras captured the scene in the Sallyport—Vences' bodycam, Roop's bodycam, Roop's car camera, and Dotson's car camera. (Dkt. No. 55, Exs. 5J, H-1, G-2, and F). Roop's car cam provided the best viewing angle but had no audio. The other three had audio, with Vences' bodycam providing the best combination of audio and visual.

The jailers applied basic first-aid to Collins and "Mr. Collins stated that his head hurt really badly that he wanted to go the hospital." (*Id.*). Collins was then transported to the local hospital. After being treated, Collins was taken to the main Harrison County Jail.

Months later during his deposition, Collins stated that he still had a drooped eye, numbness in the right side of his face, and hearing loss in his right ear as a result of the beating. (Dkt. No. 65-3, Collins Deposition, at 7–8).

### f. Charges

Dotson originally arrested Collins for Interfering with Public Duties as indicated in his Arrest Report but the report states, "On the way to the car, I evaluated the entirety of the altercation and made the decision that charging Collins with Disorderly Conduct was more appropriate because Collins had not assaulted his girlfriend or an officer." (Dkt. 65-10, Arrest Report, at 2). Thus, Dotson's complaint and book-in report show that Collins was arrested for Disorderly Conduct. (Dkt. No. 65-12, Book-in Report, at 3). Yet, a magistrate signed a form several hours after Collins' arrest reflecting the dual charges of Interfering with Public Duties and Resisting Arrest. Due to the added charge, Collins was sent to the main jail instead of the Annex. (Dkt. No. 65-8, Oden Deposition, at 3).

According to the court records, ultimately there was only the single charge of Disorderly Conduct against Mr. Collins, to which he pleaded not guilty. This charge was dismissed by the court "in the interest of justice" and the County refunded in full the fine he had paid. (Dkt. 65-16).

## II. STATEMENT OF LAW

### a. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact. . . and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). Facts are considered material if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact creates a "genuine issue" if the evidence is such that the trier of fact reasonably could resolve the factual dispute in favor of either party. *Id.* at 248. The movant has the burden of showing that there is no genuine issue of fact. *Id.* at 256. If the movant meets the initial burden, Rule 56 requires the nonmovant to present affirmative evidence and set forth specific facts showing that there is a genuine issue for trial. *Id.* All evidence must be construed in the light most favorable to the party opposing summary judgment. *Id.* at 261 n.2. Although evidence is reviewed in the light most favorable to the nonmoving party, greater weight is assigned, even at the summary judgment stage, to the facts evident from video recordings taken at the scene. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

### b. Section 1983

Section 1983 provides a claim against anyone who "under color of any statute, ordinance, regulation, custom, or usage, of any State" violates another's constitutional rights. 42 U.S.C. § 1983. "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Texas Collin Cty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

### c. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In resolving questions of qualified immunity at the summary judgment stage, the district court engages in a two-pronged inquiry. The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Id*. at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope*, 536 U.S. at 739 (quoting *Harlow*, 457 U.S. at 818).

"[T]he salient question . . . is whether the state of the law" at the time of an incident gave defendants "fair warning that their alleged [conduct] was unconstitutional." *Id*. at 741. "[N]o immunity is available for official acts when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. at 746 (citing *Saucier*, 533 U.S. at 202).

### d.  Additional Burden on Plaintiff

A qualified immunity defense alters the usual summary judgment burden of proof. Once the defense is pleaded, the burden shifts to the plaintiff, who must rebut the defense by establishing at least a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. *Vann v. City of Southaven, Mississippi*, 884 F.3d 307, 309 (5th Cir. 2018) (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)). Thus, qualified immunity cases illustrate the important of drawing inferences in favor of the nonmovant. *Id*. (quoting *Tolan*, 572 U.S. at 657).

### III.    DISCUSSION

#### a.  Dotson

Collins brought a § 1983 claim against Dotson, alleging that Dotson detained him falsely and exercised excessive force against him in violation of the Fourth Amendment. (Dkt. No. 35 at 6–7). In addition to denying Collins' allegations, Dotson also pleaded the affirmative defense of qualified immunity for both the false arrest and excessive force allegations. (Dkt. No. 53 at 3).

#### i.  False Arrest

"The right to be free from arrest without probable cause is a clearly established constitutional right." *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018) (quoting *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)). A false arrest claim, which can be brought through the vehicle of § 1983, "requires a showing of no probable cause." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" *Westfall*, 903 F.3d at 542–43 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001)). The officer must know the facts justifying probable cause at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest. *Club Retro*, 568 F.3d at 204 (citing *Sibron v. New York,* 392 U.S. 40, 62–63 (1968); *Henry v. United States,* 361 U.S. 98, 102 (1959); *Johnson v. United States,* 333 U.S. 10, 16 (1948); *Carroll v. United States,* 267 U.S. 132, 161–62 (1925)); *see also Lincoln v. Turner*, 874 F.3d 833, 842 (5th Cir. 2017).

But even if probable cause did not exist, "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)) (internal quotation marks omitted). Officers are therefore entitled to qualified immunity unless no known

probable cause for the arrest exists and the officers were objectively unreasonable in believing probable cause for the arrest existed. *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391–92 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citing *Crostley v. Lamar Cty.*, 717 F.3d 410, 422–23 (5th Cir. 2013); *Cooper v. City of La Porte Police Dep't*, 608 Fed.Appx. 195, 199 (5th Cir. 2015)).

The Fifth Circuit applies "an objective standard, which means that [it] will find that probable cause existed if the officer was aware of facts justifying a reasonable belief that an offense was being committed, whether or not the officer charged the arrestee with that specific offense." *Club Retro*, 568 F.3d at 204 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004)).

Dotson argues that he had probable cause to believe that Collins, under Texas law, had committed the offenses of (1) interference with public duties; (2) disorderly conduct; (3) public intoxication; (4) criminal mischief; and (5) reckless damage or destruction.[8] (Dkt. No. 53 at 17).

### 1. Interference with Public Duties

In Texas, a person commits the Class B misdemeanor of Interference with Public Duties "if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." Tex. Penal Code § 38.15(a)(1); *see also* Tex. Penal Code § 6.03(d) (defining criminal negligence). Dotson alleges that Collins committed this offense when he shouted at Roop as Roop watched Ms. Garcia collect clothes from the master bedroom.

Under the statute, "[i]t is a defense . . . that the interruption, disruption, impediment, or interference alleged consisted of speech only." Tex. Penal Code § 38.15(d). This defense applies even if the person argues with the officers. *See Carney v. State*, 31 S.W.3d 392, 396 (Tex. App.—Austin 2000, no pet.); *see also Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007) (holding that

---

[8] Dotson only mentioned the last two offenses in a footnote, and it was not further briefed by any of the parties. Nevertheless, this Court will address the two in an abundance of caution. (Dkt. No. 53 at 17 n.9).

a plaintiff's yelling and screaming at deputies about their right to search her home "alone does not take her conduct out of the realm of speech"). But failing to follow a deputy's instruction has been held to move beyond the realm of speech. *See Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (holding that the plaintiff's conduct moved beyond speech where he failed to follow the deputy's instruction to move his truck). The statute thus criminalizes: (1) interference in some way that is beyond speech with (2) the performance of an officer's official duties. *Westfall*, 903 F.3d at 543 (5th Cir. 2018) (citing *Carney*, 31 S.W.3d at 395–96).

When viewing the evidence, specifically Vences' bodycam video, in the light most favorable to Collins, the Court finds that Collins, at most, verbally argued with Roop. Further, he was walking to his seat when Vences instructed him to sit and accordingly, followed Vences' instructions to sit, albeit slowly. Vences repeating himself does not change that.

Thus, a reasonable jury could find that probable cause did not exist and that an officer could not reasonably conclude that probable cause existed. Under these facts, a reasonable officer could not conclude that Collins' conduct was an unlawful interference due to the statutory defense and the clear case law holding that argument, without more, is not an interference with public duties in Texas.

### 2. Disorderly Conduct and Public Intoxication

In Texas, the Class C misdemeanors of disorderly conduct and public intoxication require the charged conduct occur in a public place. *See* Tex. Penal Code Ann. §§ 42.01(a); 49.02(a). Generally, a home is considered a private place. *See* Tex. Penal Code Ann. § 47.01 (defining a private place as somewhere the public does not have access to); *see also* Tex. Penal Code Ann. § 1.07(40) (defining a public place as any place the public has access to). Yet, Dotson argues that the open door and broken window converted the private residence where Collins was arrested into

a public place since Collins could be heard outside. Dotson points to § 42.01(c), which states that "[f]or the purposes of this section: an act is deemed to occur in a public place . . . if it produces offensive or proscribed consequences in the public place . . . ." Tex. Penal Code Ann. § 42.01(c).

The Court does not read the quoted section as converting a private residence into a public place. Dotson offers no case law to support his argument. The few relevant cases deal with outdoor common areas, instead of, as here, the inside of a house. *See, e.g., Nixon v. State*, 928 S.W.2d 208 (Tex. App. 1996), *vacated*, 942 S.W.2d 625 (Tex. Crim. App. 1997) (finding that a backyard open to the public could be considered a public place). Further, the evidence does not support the assertion that Collins could be heard outside. Even if he could, the house was surrounded by private land, weakening the argument that Collins' actions "produce[d] its offensive . . . consequence in [a] public place" such as to make the house a public place. Tex. Penal Code Ann. § 42.01(c). Finally, Dotson argues that both Roop and Vences agreed with Dotson's mistaken assertion, meaning it was reasonable. The fact that all three expressed the same opinion does not make it any less unreasonable.

A reasonable jury could find that the house-in-question was not a public place and that no officer could reasonably conclude it was. Since a public place is required for the offenses of disorderly conduct and public intoxication, it follows that a jury could conclude that probable cause did not exist for the offenses and that an officer could not reasonably conclude that it did exist when Dotson arrested Collins.

### 3. Criminal Mischief and Reckless Damage or Destruction

In Texas, a person commits the offense[9] of Criminal Mischief "if, without the effective consent of the owner, (1) he intentionally or knowingly damages or destroys the tangible property

---

[9] The level of offense depends on the amount of pecuniary loss caused by the damage or destruction and can be anywhere from a Class C misdemeanor to a felony of the first degree. Tex. Penal Code Ann. § 28.03(b).

of the owner . . . . Tex. Penal Code Ann. § 28.03. A person commits the Class C misdemeanor of Reckless Damage or Destruction "if, without the effective consent of the owner, he recklessly damages or destroys property of the owner." Tex. Penal Code Ann. § 28.04. Thus, the offenses are only applicable if the person does not have the effective consent of the owner.

The video evidence shows that Collins loudly and repeatedly told the officers that he owned the house and the items within.[10] When Collins argued he could destroy his own house if he wanted, Dotson responded, "You're absolutely right." (Dkt. No. 55, Ex. 5D, Vences bodycam starting at 3:52). Later Dotson told Collins, "[Y]ou're not going to jail because at that point you tore up your own shit." (*Id.* starting at 11:03).

Taking the facts in the light most favorable to Collins, the Court finds that Dotson thought Collins was the owner of the house and destroyed items. As the purported owner, Collins implicitly would have the effective consent of the owner, meaning he could not commit the two offenses.

While it was later determined that the house and some of the items belonged to Collins' fiancé, the evidence does not show that Dotson knew this when he arrested Collins. Dotson cannot rely on his after-acquired knowledge that Collins was not the owner of the items as justification for probable cause since "post-hoc justifications based on facts later learned cannot support an earlier arrest." *Club Retro*, 568 F.3d at 204.

Thus, a reasonable jury could find that probable cause did not exist and that an officer could not reasonably conclude that probable cause did exist for criminal mischief and reckless damage or destruction.

In conclusion, this Court finds that the factual record does not justify a finding of probable cause for any of the five offenses Dotson argues Collins committed. Furthermore, a reasonable

---

[10] Section I. Background, subsection b. Events at House and Arrest, ¶ 6.

jury could conclude that it was objectively unreasonable for Dotson to believe that such probable cause existed when he arrested Collins. Accordingly, Dotson is not entitled to qualified immunity from Collins' claims that Dotson wrongfully arrested him.

### ii. Excessive Force

Collins alleges that Dotson used excessive force by repeatedly punching him in the face and head in the Sallyport of the Jail Annex. (Dkt. No. 35 at 7–8). To state a claim for use of excessive force in the Fifth Circuit, a plaintiff must show that he or she "(1) suffered some injury which (2) resulted from force that was clearly excessive to the need for force; (3) the excessiveness of which was objectively unreasonable." *Heitschmidt v. City of Houston*, 161 F.3d 834, 839 (5th Cir. 1998). The use of force should be judged, not from hindsight, but instead from the perspective of a reasonable officer at the time. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Claims of excessive force are fact-intensive; whether the force used was "clearly excessive" and "clearly unreasonable" depends on "the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The relevant considerations (often referred to as the *Graham* factors) include: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether he was actively resisting arrest or attempting to evade arrest by flight. *Id*.

The use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others. *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). Yet, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive and objectively unreasonable. *See Bush v. Strain*, 513 F.3d 492, 501–02 (5th

Cir. 2008); *Gomez v. Chandler*, 163 F.3d 921, 922 (5th Cir. 1999). Even if the plaintiff actively resists, officers are not automatically entitled to assault him. *See Deville v. Marcantel*, 567 F.3d 156, 167–68 (5th Cir. 2009) (quoting *Gomez*, 163 F.3d at 923) (noting officers "must assess not only the need for force, but also the 'relationship between the need and the amount of force used'").

Dotson admits that the videos of the Sallyport are "at best—difficult to watch." (Dkt. No. 53 at 20). Yet he essentially argues that police officers are given "broad deference" to make split-second decisions and therefore, his use of force was not "beyond debate." (*Id*. at 25).

Regarding the first element, it is undisputed that Collins suffered severe injuries from Dotson's eight closed-fist strikes to the head. His injuries were previously described,[11] and they required immediate hospitalization. Thus, this element is met.

The second element is that the force be clearly excessive to the need. Dotson struck Collins eight times. Dotson claims he did this because he perceived Collins trying to bite another officer. As an initial matter, Dotson's claim that Collins was trying to bite someone is unsupported by the multiple recordings of that night.

For argument's sake, even if Dotson correctly perceived Collins trying to bite an officer, his behavior was disproportionate. Dotson struck Collins three times rapidly, paused for a moment as Collins was put into the restraining chair, and then resumed, striking him five more times. While the Court need not determine whether any use of force would have been reasonable, eight blows is clearly excessive. Dotson's counsel, during the hearing on qualified immunity, was unable to identify any scenario where so many blows would be justified. (*See* Dkt. No. 75). Further, Jailer Oden testified that the police have more appropriate techniques for this very scenario. (Dkt. No. 64-10, Oden Deposition, at 12) ("A. . . . And then Smith applies pressure to his pressure points. Q.

---

[11] *See* section I. Background, subsection e. Aftermath.

Is that something y'all are trained to do? A. Absolutely. It just depends on how hard you're going to do it. . . If the guy is trying to, like spit, like, through his mouth, we're going to do it a little bit harder."). Thus, this second element is met.

As to the third element, when applying the *Graham* factors, Dotson's use of force was objectively unreasonable. First, Collins was charged with interfering with public duties—a minor offense.[12] *See* Tex. Penal Code § 38.15(b) ("An offense under this section is a Class B misdemeanor."); *see also Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (classifying a Class C misdemeanor as "a minor offense militating against the use of force"); *Reyes v. Bridgewater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding the "severity" *Graham* factor cautioned against use of force where the alleged crime was "at most a misdemeanor").

Second, taking the facts in the light most favorable to Collins, no reasonable officer could conclude that Collins posed a threat to Dotson or the other officers. The video evidence shows the barefoot and unarmed Collins handcuffed, with his arms behind his back. Six police officers, with decades of experience between them, surrounded Collins. Four of those officers, including Dotson, were holding Collins. Further, while Collins had made some outlandish statements, he never once attempted to physically engage someone that evening. Even his statements about being "ready" as they were entering the Sallyport were made in context with his expressed belief that the officers planned to beat him. (Dkt. No. 55, Ex. 5G-2, Dotson car camera starting around 9:45).

Third, Collins was not trying to, nor could he, flee for the same reasons that he did not pose a threat. While it can be argued that Collins was resisting, it was at most a passive resistance since he was pulled out of the car head first and did not have his feet underneath him.[13] This is supported

---

[12] Some dispute exists over what Collins was charged with. (*See* Dkt. No. 65 at 10–12). Regardless, all five offenses Dotson raises, as discussed in the previous section, were of a minor nature. (Dkt. No. 53 at 17).

[13] The Fifth Circuit has drawn a distinction between "active" and "passive" resistance. *See Deville*, 567 F.3d at 167; *see also Poole v. City of Shreveport*, 691 F.3d 624, 640–41 (5th Cir. 2012) (citing helpful cases from other districts).

by the video evidence, his statement as the door was opened of "[l]et me stick my feet out," and Roop's discussion that "Collins [was] passively resisting . . . ." (Dkt. No. 55, Ex. 5J, Vences bodycam starting at 0:37) (Dkt. No. 53-6, Roop Deposition, at 7–8). The third *Graham* factor supports this distinction, as it looks to see whether the plaintiff was "actively resisting arrest" which is not the case here. *Graham*, 490 U.S. at 396. Thus, this element is met.

Fourth, the Fifth Circuit has held that "[i]n evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Westfall*, 903 F.3d at 549 (quoting *Deville*, 567 F.3d at 168 (quoting *Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir. 2006)). The injury to the right side of Collins' face that allegedly resulted from this incident is serious. This supports a finding of unreasonableness. Further, the length of time—5 seconds—and number of strikes— eight—show this was not a split-second decision, as Dotson argues. Dotson had the time and ability to realize the immorality of his actions, especially when he paused after the first three strikes. His failure to do so evinces a clear lack of reasonableness. Even the Bystander Defendants all agree that Dotson's use of force was objectively unreasonable. (*E.g.*, Dkt. No. 55 at 17).

Accordingly, Dotson's motion for summary judgment of qualified immunity is **DENIED** on both the claims of unlawful arrest and excessive force.

### b. Bystander Defendants

Collins also brought § 1983 claims against the five other officers present in the Sallyport under a theory of bystander liability for failing to intervene or prevent Dotson's alleged excessive force. (Dkt. No. 35 at 9–10). No claim of false arrest is made against these defendants. The

Bystander Defendants each contend that they are entitled to qualified immunity. (Dkt. Nos. 55–59).

In resolving questions of qualified immunity at summary judgment, the district court first asks whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal right. Second, the district court asks whether the right in question was "clearly established" at the time of the violation. *Tolan*, 572 U.S. at 655–56.

Regarding the first element, the Fifth Circuit has held that an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force[14] may be found to have violated a federal right under § 1983 through a theory of bystander liability. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). Specifically, an officer may be liable if "the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) and citing other supporting cases).

The Bystander Defendants all agree that Dotson's use of force was objectively unreasonable. (*E.g.*, Dkt. No. 55 at 17). Instead, they argue that their inaction in the Sallyport was because "[i]t was impossible for the officers to know what provoked Deputy Dotson's actions, perceive the events and react to them." (*E.g., id.* at 24).[15] Thus, they argue that they did not have a reasonable opportunity to prevent the harm since "[b]y the time any of [them] knew what was going on, the entire event was over." (*E.g., id.* at 24). Collins disputes that they were so shocked

---

[14] Although *Hale* most often applies in the context of excessive force claims, other constitutional violations also may support a theory of bystander liability. *Whitley*, 726 F.3d at 646 n.11 (citing other cases holding as such).

[15] The Bystander Defendants' motions were substantively identical except for section B, the statement, deposition, and affidavit section of each movant.

that they could not act. (Dkt. No. 64 at 16). Finally, it is undisputed that the Bystander Defendants took no action to prevent the harm.

As for the second part of the qualified immunity test, bystander liability was "clearly established" when the events that form the basis of this lawsuit took place. *Tolan*, 572 U.S. at 656. The Fifth Circuit first recognized a bystander liability claim in *Hale*, a decision issued decades before this event took place. Since then, the Fifth Circuit has continued to recognize the doctrine. *E.g., Whitley*, 726 F.3d 631. Therefore, the second part, should it be reached, is met.

### i. Roop

Roop was present at the Sallyport when Dotson struck Collins eight times. He admitted he witnessed some of the strikes. (Dkt. No. 64-9, Roop Deposition, at 11). He agreed that he did not see anything that would justify Dotson's actions. (*Id*. at 16–18). He also agreed that he had a duty to protect a prisoner. (Dkt. No. 55-3, Roop Deposition, at 13). Thus, Roop should have known that Dotson was violating Collins' constitutional rights when he was striking Collins.

Instead, Roop argues that that he did not have a reasonable opportunity to prevent the harm since he did not have enough time to register what was happening during the approximately five-second incident. The video evidence suggests otherwise. Roop's bodycam in the Sallyport had a clear angle of Dotson striking Collins.[16] When Dotson first struck Collins, Roop was holding Collins' head down. That Roop was holding Collins heavily supports the conclusion that he could have intervened and prevented some of the harm.

Instead, Roop let go of Collins, covered his bodycam, and walked away, even though Collins was not yet secured in the restraint chair. As Dotson continued to strike Collins, Roop yelled to Collins, "Get the f… in that chair." (Dkt. No. 55, Ex. F, Roop bodycam starting at 1:23).

---

[16] Roop argues his eyes were not where his bodycam was aimed. (Dkt. No. 55-3, Roop Deposition, at 18–19).

A reasonable juror could easily conclude that Roop knew Dotson was hitting Collins and walked away—choosing not to act.

Further, Roop's argument that five seconds is not enough time to react is not persuasive. Roop was a licensed police officer with thirteen years' experience at the time of the incident. Roop had experience as a jailer as well as a patrol deputy. Roop saw Dotson arrest Collins over a joke at the house, saw Dotson travel at an unusually high rate of speed to the jail, and came to the Annex because Dotson asked for backup. Roop even stated that "we were trying to keep [Dotson] away from the situation[,]." (Dkt. No. 55-3, Roop Deposition, at 12). He should have been prepared to react, and react quickly, should anything out of the ordinary occur. Five seconds is ample time in such circumstances, when the officer is on notice and holding the prisoner.

The summary judgment evidence is viewed in the light most favorable to the non-movant, with greater weight assigned to the facts evident from video recordings taken at the scene. *Carnaby*, 636 F.3d at 187. Viewing the evidence currently before the Court, a reasonable jury could conclude that Roop had a reasonable opportunity to realize the excessive nature of Dotson's actions and intervene to stop it.

### ii. Oden and Smith

Oden and Smith are in a similar situation to Roop. Both were present and agree that what Dotson did that night to Collins was not appropriate. Yet they both argue their inaction is justified since they did not have enough time "to observe, process and react to what was occurring in time to intervene." (*E.g.*, Dkt. No. 56 at 10). They argue that even though they were holding Collins, they were not focused on him. Instead, they were focused on trying to get him into the restraint chair. (Dkt. No. 56-3, Oden Deposition, at 7).

The videos paint a different picture. As Dotson begins to strike Collins, loud enough to be heard on the bodycams, the jailers drag Collins into the restraint chair. Oden testified that he felt Collins go limp. (*Id.* at 25). Then, while they hold Collins' arms, they turn and watch Dotson strike Collins five more times. (Dkt. No. 55, Ex. 5H-1, Roop car camera starting at 10:32).[17] Construing the evidence in the light most favorable to Collins, a reasonable jury could conclude that those few seconds Oden and Smith were watching Dotson strike Collins as they held Collins' limp body presented a reasonable opportunity for them to intervene.

### iii. Vences and Mathers

Vences and Mathers were also present in the Sallyport and were part of the extraction team. Yet, importantly, neither held Collins during the extraction as they were both a few feet away from Collins and Dotson with the other officers in between them and Collins. Mathers claims that he only saw the last three blows. (Dkt. No. 57-3, Mathers Deposition, at 13). Vences claims he only saw the last blow. (Dkt. No. 58-3, Vences Deposition, at 5). Those last few blows occurred within the span of a second or two. (Dkt. No. 55, Ex. 5H-1, Roop car camera starting at 10:32). Considering the fact that they were not holding Collins and did not perceive the blows until the attack was almost over, a reasonable jury could not conclude that either Mathers or Vences could have physically intervened in time to prevent the injury.

### c. Motions to Strike

Collins asked this Court to strike Paragraphs 6.B.–E. from the affidavit of William Ray Jennings, Jr., the Bystander Defendants' expert. Collins states that the affidavit contains "sheer speculation," which he argues is inadmissible. (*See* Dkt. No. 69 at 7–10).

---

[17] While this camera did not have relevant audio, it provided the best angle for this critical moment.

Dotson objected to some of Collins' response exhibits: (1) photographs, attached as Exhibit 65-5; (2) Harrison County's policy manual, attached as Exhibit 65-6; (3) a purported complaint against Dotson, attached as Exhibit 65-16; and (4) Collins' expert report, attached as Exhibit 65-18. Dotson argues that these items are either inadmissibly prejudicial, unauthenticated, or both, and thus, asked this Court to strike them. (*See* Dkt. No. 68).

This Court held a hearing regarding motions at issue. (*See* Dkt. No. 75). Since then, the Fifth Circuit held that it is error to strike unsworn expert reports offered in opposition to a motion for summary judgment unless the court also finds that the contents of the reports "cannot be presented in a form that would be admissible in evidence." *Patel v. Texas Tech Univ.*, No. 19–10009, 2019 WL 5418084 (5th Cir. Oct. 23, 2019) (citing Fed. R. Civ. P. 56(c)(2)).

Having reconsidered the granting of the motion to strike as to Collins' expert report in light of the new Fifth Circuit opinion, the Court now **DENIES** both motions to strike. Thus, the expert reports are part of the record, although the Court did not find them helpful regarding the motions for summary judgment on the issue of qualified immunity.

## IV. CONCLUSION

The motions for summary judgment on qualified immunity by Dotson, Roop, Oden, and Smith are **DENIED**; the motions for summary judgment on qualified immunity by Vences and Mathers are **GRANTED**; and the motions to strike by Dotson and Collin are **DENIED**.

**SIGNED this 7th day of November, 2019.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE